John Stone, by his will, April 27, 1695, ‘ devised his plantation and the profits of his slaves and personal estate, to his wife during life, and declares Iris will to be, that his son Richard Metualf and Arm his wife live upon the said plantation after her death, during their lives, and also keep and employ the negroes upon the said, plantation, making use, as they shall see cause, of all the profits of the said lands, and clear produce of his said negroes, stock and plantation, except the increase of the said negroes, hereafter given atvay.’ Then he 4 devises to Mary and Elizabeth, two daughters of Richard and Ann Metualf, a negro a piece, by name, and to John, their son, a negro child, the next that should be born.’ Then fob lows this clause : ‘ I give unto my daughter Ann’s children, that she shall bear hereafter, a negro child a piece, as it shall please God the negro women shall bear them. Further, it is my; will that if any of the said children prove disobedient to them, that the said Richard Metualf and Ann his wife, do keep them until they shall submit themselves unto their parents.’ Then he ‘ gives all his personal estate, to be divided among Richard and Ann Metualf’s children, after their deaths, and makes Richard Metualf, Henry Fleet, and Edwin Conway, executors.’ The testator’s wife died before him, and Metualf, upon his death, got all tire slaves and personal estate into his possession, without proving the will, which wjas not produced till after his death, in 1699, and was then proved in Richmond Court by the witnesses only. Ann Metualf, after her husband’s death, got possession, and marrying one Barrow, he was thereby in possession. Ann survived Barrow, and died 1728. She had four children by Metualf, Mary, Elizabeth, John, aforesaid, and Sarah, bom after the will wTas made, to whom, after their mother’s death, Stone’s estate belonged by the will. The plaintiff, one of these children, having never received any part except the slave devised to her, sues out administration, cum testamento annexo, (Metualf and Conway, two of the executors, being dead without proving the will, and Fleet, the other, refusing,) and brings this bill for the discovery of the personal estate and slaves of Stone, that they may be divided according to the will, and she have her fourth part. The defendant set up several titles to these slaves, some of them under the other children of Richard and Ann Me-tualf, and others under the children of Ann by her second husband, Barrow, who they say are entitled to a child a piece ; and the defendant, Rust, has some plate and other things of Stone’s estate. Before I speak to the merits of this case, I must beg leave to clear *44 it of two objections, that have been very much insisted on at the trial at law. 1st. The staleness of the plaintiff’s claim, after a-division, as pretended, of the slaves, pursuant to Stone’s will. 2nd. The irregularity pretended in the plaintiff’s suing out administration. As to the first, it is true the testator has been dead a long time, but the plaintiff’s title did not accrue upon his death, but upon the death of Ann Metualf, the survivor of the devisees for life, which happened no longer ago than 1728. In 1729, tire plaintiff sued out administration, and this suit has been depending ever since. So that we sued as soon as our title happened, and as to the division talked of, the plaintiff never had one slave or other part of the estate, except the slave devised to her. So that whatever division has been made among the rest, is nothing to her; she has never had her part, and surely there is no injustice in seeking to obtain it. Second, as to the irregularity in obtaining the administration. I apprehend that point cannot now be properly enquired into. In England, we know, the granting administration is the province of the spiritual courts, and the chancery cannot control them; but if they proceed irregularly, the course is to obtain prohibitions and mandamus’s from the common law courts. And in the case of a probate of a will, though great fraud has appeared in making the will, equity has refused to set aside the will so long as the probate has remained in force. 2. Vern. 8, Archer and Moss, 76. Nelson v. Oldfield. Now this court has, it is true, a three fold jurisdiction, as a court of equity, a court of law, and it has also a jurisdiction of testamentary matters. But then these jurisdictions must not be confounded. The proper bounds between each ought to be kept up, and this court, as a court of equity, will no more intermeddle with testamentary matters, than, if they were sitting as a court of law, they would judge by the rules of equity. This administration then, must be supposed regular till it is repealed, which this, as a court of equity, cannot do. But to take away all objection of cavil, I will shew that this administration was regular, perfectly; the course of the spiritual court being where the executors refuse, or die before probate, to grant such an administration as this, viz. cum testamento annexo. 1 Salk. 304. Wankford v. do. and that was the case here. Two of die executors were dead, and the other refused. An administration de bonk non would have been improper, as none of the executors ever proved the will. I will only add, as the plaintiff has a right by the will, she might have brought this suit, without taking administration at all; but she was first advised to bring an action at law, and so administration was necessary.
The questions arising upon the merits of this cause may be four. *45 1, What estates Richard and Ann Metualf had in the slaves and personal estate, by die will. 2. Whether the devise of the personal estate to their children after their deaths be good, and what will pass by the devise of personal estate. 3. Whether the devise to John Metualf, and to the children said Ann should bear thereafter, of a negro child a piece, as the negro women should bear them, be a good devise. If it he, then 4. Whether Ann’s children by her second husband, Barrow, are entitled to a negro a piece by that devise.
1. As to the interest Richard and Ann Metualf had : there is no express devise of the slaves and personal estate to them; the testator only directs that they shall keep and employ the slaves upon the land, making use of all the profits of his land, and clear produce of negroes, stock, &c. which can be construed no more than tire use or occupation. But then by the devise to their children after their deaths, they have the use for life by implication, and surely it cannot be pretended they had any greater estate or interest. At least, for my own part, I cannot conceive the least color or pretence, to give them any thing more. And then, certainly,
2. The remainder limited to their children after their deaths, is good. There is only personal estate mentioned in the devise; however, it will hardly be disputed that slaves pass under the devise, because, at that time they were no more than personal estate. The question then is, whether the remainder of a chattel personal may be limited after the death of one or more persons. And surely it will not be denied that it may. It was, indeed, formerly a question ; though it was always allowed that the use might be given to one for life with a remainder over, which seems to be our case. But no difference is made between a devise for life, and the devise of a use for life, as the testator’s intention is the same in both cases. To serve that intent, the judges will construe the intent of a devise for life, to be only of the use, and then the remainder over is good. These sorts of devises were only introduced in terms for years, and settled in Matthew Manning’s case, 8 Rep. 94. b. under the name of executory devises, and after-wards in Lampet’s case, 10. Rep. 47. b.; and are now extended equally to chattels merely personal, provided the limitation be appointed to arise within the compass of a life, or lives in being ; and it makes no difference be the lives ever so many, for there must be a survivor, and so it is only for the life of . that survivor.; as a learned judge used to say, the candles are all lighted at once. 1 Sid. 451. 1 Salk. 229. The cases upon tins head are very numerous; I shall only mention a few. Wood v. Sanders, *46 1. Ch. C. 131. and cited in Duke of Norfolk’s case. 3. Ch. C. 35. was a devise to the father.for sixty years, if he so long live; then to the mother sixty years, if she so long live; then to John and his executors, if he survive his mother and father; if he died in their life-time, having issue, then to his issue ; but if he died without issue, living the father or mother, then to Edward. John died without issue, living the father and mother, and it was adjudged that the remainder over was good. Here the remainder was not to take effect till after the death of three persons, and the contingency of one dying without issue in the life of another, which is stronger than our case.
Smith v. Clever, 2 Vern. 38. 59. The testator directed the residue of his estate to be put to interest, and half the interest paid to his sister during her life, and the other half to her daughter, and after the mother’s death, the daughter to have all the interest during her life, and if she died without issue of her body, he devised the principal over. The daughter died without issue, and the remainder over was good. So in Rachael’s case cited in that supra, the devise was to the wife for life, and if she were with child, then to that child, and if that child died without issue, remainder over, which remainder was adjudged good. In both these cases the limitation is after two lives, and a contingency of dying without issue.
Chargess v. Duchess of Albemarle. Devise of jewels for life, remainder over. 2 Vern. 245. Hyde and Parrot, 331. S. P. So Pinbury and Ellpin, 758. and 766. was a devise to wife, and if she died without issue by testator, eighty pounds to remain over ; remainder good. And the like point was adjudged in this Court, April 1734, between Lightfootand do. where the remainder was limited upon a double contingency of dying without issue, or if there should be any failure in the male line. For further authorities, see Fitzgibbons, 314. Goldsmith’s company v. Hall. But this remainder is made good by the express provision of our act of Assembly of 1727, which is, that, ‘ where any person before the act, had by will disposed of any slaves for life or lives, and thereupon limited any remainder, such remainder shall be good;’ which is exactly our case.
3. Whether the devise to John Metualf, and the children that Ann Metualf should have, of a negro child a piece, as the negro women should bear them, be a good devise ;• and I conceive not. A devise may be to a person not in esse, but I never yet read that a thing not in esse could be bequeathed, It may by the civil law. 2 Domat. 159. It is a known rule, that a bare possibility cannot be devised. So is the late case of Bishop and Fountain, 3. Lev. *47 (see Jacob’s Diet. tit. possibility) which was a remainder limited after an estate tail. I know nothing in our law so nearly resembling this case, as that 1 have mentioned of a possibility. Cases in point cannot be expected, there being no slaves in England. The case of villeins comes the nearest to slaves, but I find nothing concerning them as to this point. It is certainly no more than a possibility whether a woman shall have a child, and therefore, I think the devise of a child that shall be afterwards bom, is not good. Slaves are to be considered in this respect as chattels, and were really nothing more at the time of this devise. Now I believe the devise of a calf or a colt that should be born, would not be good. Besides it would be very inconvenient to allow of such devises. The owner of the mother we may suppose, would not be very careful either of die mother in her pregnancy, or the child after it was born, and some time it must remain with its mother: this might occasion the loss of many an infant, which is certainly a most humane consideration. Besides, the owner of the mother must be put to charge and trouble, which seems unreasonable, where he is to receive no benefit. The children, therefore, ought to follow die property of the mother, especially in this case, where neither person or thing was in esse at the time of the devise. If it be said that the intention of the testator must be observed, I agree to it; that is, where his intention is consistent with the rules of law. No intention of a testator is sufficient to entail a chattel, because it is against a rule of law, and so here it is against a rule of law, that a possibility should be devised. And if this devise should be allowed, then there remains another question.
4. Whether the children of Ann Metualf by her second husband, Barrow, be entitled to a child a piece by this devise. The words of the will are these, ‘I give unto my daughter Ann’s children that she shall bear hereafter, one negro child a piece, as it shall please God that the negro women shall hear them.’ if we went no further, and considered the case upon this part of die clause by itself, it would be clear the children by Barrow, would he entitled. But the intention of a testator, must be collected from the whole will, and therefore, when we consider the scope of this before us, and particularly what immediately follows the devise above in the very same clause, it will be evident that die testator intended only Ann’s children by Metualf. What follows is ‘ Further, it is my will if any of the said children prove disobedient to them, that the said Richard and Ann his wife, do keep them until they submit themselves in obedience to their parents.’ After reading the whole clause, there will need little comment to prove that the children here meant, are the children of Richard and *48 Ann Metualf, and no other, The latter part of this clause is not strict grammar, but the meaning is obvious enough. ‘If any of the children prove disobedient to them here ‘ them’ must refer to two persons mentioned before, but Ann only is mentioned in the first part of die clause, which makes it more than probable, that it was the mistake of the writer in not naming Richard in the first part. Upon this supposition, which I am sure is not without foundation, the clause will be reconciled to grammar and good sense* and the point put beyond dispute. But further, ‘them’ here must be understood of the parents of the children, for who else can children be disobedient to, but their parents? Besides, it appears from the latter part of the clause, ‘ till they submit to their parents.’ Now who these parents are, is immediately explained. ‘ If the said children prove disobedient to them, the said Richard and Ann Metualf shall keep, &c.’ Here ‘ them’ is sufficiently explained to be Richard and Ann Metualf; then the word ‘ said,’ (‘ said Richard and Ann’ )proves they should have been both named before. It is absurd to suppose the testator should direct Richard and Ann Metualf to keep slaves devised to the children of Ann by a second husband, because Richard must be first dead before she could have such children. So that of necessity, he must mean the children of Richard and Ann Metualf and no other. And upon consideration of the whole clause, I think nothing can be plainer. It is further evident from the whole scope of tins will, the testator had in view the providing for Ann’s children, by Richard Metualf only. It is more than probable he had not under consideration what happened after, that Richard Metualf would die first, and Ann marry a second husband, since there is not the least notice taken of that, or of the children of such second marriage, through the whole will. The remainder of the personal estate is limited to the children of Richard and Ann Metualf, and no other children named, or I dare say, intended by the testator. If it be objected that the children of the second marriage are as nearly related to the testator as those of the first, and it was as reasonable he should provide for them as the other: I answer, perhaps he would have done so, could he have foreseen there would have been such children j but as I have said, he had no such thing in view or under consideration, he never thought of such second marriage, and as to any equity that may be pretended in construing the will in favor of the children of the second marriage, there is no equity in construing a will against the plain intent and meaning of a testator. Such a latitude in construing a will, would subvert the right men naturally have of disposing of their own. A man is not bound to give Ms estate in the most rea *49 sonable and equitable manner, but his will is the law as to that. The question is not what the testator ought to have done, but what he has done. So that the question is not whether the children of the second marriage ought not, in equity, to have a part of their grandfather’s estate, but whether the grandfather has given them any by his will. And that I conceive clearly, he has not; he never so much as thought of them.
Upon the whole, I hope it appears that Richard and Ann Met-ualf had only the use of the slaves and personal estate during life : that the remainder to their children, alter their deaths, is good, and that the devise of the negro children not bom, is void ; or if it be not, that the children of Ann by her second husband, can claim nothing by that devise : and so we pray a decree that the slaves and personal estate of the testator now in being, may he delivered up to the plaintiff to be divided according to the will.
In this case it was agreed, that the remainder to the children of Ann and Richard Metualf was good, and that the devise of the negro children not in esse at the testators’ death was void,* and so the court decreed an account of the slaves and personal estate, in order to have them divided pursuant to Stone’s will. October, 1736.
Reported by Edward BarradaSl, Esq.

 Dandridge v. Lyon, 1791, contra.